O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

NATIVIDAD S. APODACA,           )   Case No. CV 11-10111-JPR
                                )
                Plaintiff,      )
                                )
        vs.                     )   MEMORANDUM OPINION AND ORDER
                                )   AFFIRMING THE COMMISSIONER
MICHAEL J. ASTRUE,              )
Commissioner of the Social      )
Security Administration,        )
                                )
                Defendant.      )
_____)

**I.   PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision
denying her application for Social Security disability insurance
benefits ("DIB").  The parties consented to the jurisdiction of
the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C.
§ 636(c).  This matter is before the Court on the parties' Joint
Stipulation, filed August 23, 2012, which the Court has taken
under submission without oral argument.  For the reasons stated
below, the Commissioner's decision is affirmed and this action is
dismissed.

**II.  BACKGROUND**

     Plaintiff was born on February 3, 1968.  (Administrative

1

Record ("AR") 82.)  She has an 11th-grade education.  (AR 87, 359.)  From 1999-2001, Plaintiff worked as a crossing guard; from 1999-2003 and 2005-07 she worked for various employers as a cook helper; from 2004-07 she worked as a babysitter; and from 2007-08 she worked for EZ Lube as a store laborer, performing different functions.  (AR 98, 361-62, 375-76, 380.)  On November 30, 2007, Plaintiff injured her spine and neck after slipping and falling at work, though she apparently continued to work for some time afterward.  (AR 65 (worker's compensation compromise and release form, noting November 30, 2007, as disability start date), 82 (noting "alleged onset date" of November 30, 2007), 361 (explaining that Plaintiff tried to work for "a couple of months" after injury).)[1]

On April 26, 2010, Plaintiff filed a DIB application, alleging that she had been unable to work since November 30, 2007, because of neck and back injuries, knee pain, a head injury, and shoulder pain.  (AR 82-86.)  After Plaintiff's application was denied, she requested a hearing before an Administrative Law Judge ("ALJ").  (AR 35.)  A hearing was held on March 17, 2011, at which Plaintiff appeared and testified on her own behalf.  (AR 353-94.)  Plaintiff's boyfriend, Christopher Villasenor, and Vocational Expert ("VE") Freeman Leeth also testified.  (AR 374-94.)  In a written decision issued on March 25, 2011, the ALJ determined that Plaintiff was not disabled.

---

[1]At the hearing, Plaintiff claimed that she was injured on July 31, 2007.  (AR 359.)  The evidence in the record, however, indicates that she was injured on November 30, 2007.  (See AR 65, 82.)

2

(AR 17-28.)  On October 6, 2011, the Appeals Council denied

Plaintiff's request for review.  (AR 7-9.)  This action followed.

**III. STANDARD OF REVIEW**

    Pursuant to 42 U.S.C. § 405(g), a district court may review

the Commissioner's decision to deny benefits.  The ALJ's findings

and decision should be upheld if they are free from legal error

and are supported by substantial evidence based on the record as

a whole.  § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91

S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481

F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such

evidence as a reasonable person might accept as adequate to

support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter

v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than

a scintilla but less than a preponderance.  Lingenfelter, 504

F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880,

882 (9th Cir. 2006)).  To determine whether substantial evidence

supports a finding, the reviewing court "must review the

administrative record as a whole, weighing both the evidence that

supports and the evidence that detracts from the Commissioner's

conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.

1996).  "If the evidence can reasonably support either affirming

or reversing," the reviewing court "may not substitute its

judgment" for that of the Commissioner.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

    People are "disabled" for purposes of receiving Social

Security benefits if they are unable to engage in any substantial

gainful activity owing to a physical or mental impairment that is

expected to result in death or which has lasted, or is expected

3

1  to last, for a continuous period of at least 12 months.   42

2  U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257

3  (9th Cir. 1992).

4        A.   The Five-Step Evaluation Process

5        The ALJ follows a five-step sequential evaluation process in

6  assessing whether a claimant is disabled.   20 C.F.R.

7  § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th

8  Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the

9  Commissioner must determine whether the claimant is currently

10  engaged in substantial gainful activity; if so, the claimant is

11  not disabled and the claim is denied.   § 404.1520(a)(4)(i).   If

12  the claimant is not engaged in substantial gainful activity, the

13  second step requires the Commissioner to determine whether the

14  claimant has a "severe" impairment or combination of impairments

15  significantly limiting her ability to do basic work activities;

16  if not, a finding of not disabled is made and the claim is

17  denied.   § 404.1520(a)(4)(ii).   If the claimant has a "severe"

18  impairment or combination of impairments, the third step requires

19  the Commissioner to determine whether the impairment or

20  combination of impairments meets or equals an impairment in the

21  Listing of Impairments ("Listing") set forth at 20 C.F.R. Part

22  404, Subpart P, Appendix 1; if so, disability is established and

23  benefits are awarded.   § 404.1520(a)(4)(iii).   If the claimant's

24  impairment or combination of impairments does not meet or equal

25  an impairment in the Listing, the fourth step requires the

26  Commissioner to determine whether the claimant has sufficient

27

28

residual functional capacity ("RFC")[2] to perform her past work; if so, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(iv).  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work in the economy.  § 404.1520(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis. Id.; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since April 1, 2008.[3]  (AR 22.) At step two, the ALJ concluded that Plaintiff had the severe impairments of lower back and neck pain secondary to degenerative disc disease and obesity.  (Id.)  At step three, the ALJ

---

[2]RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[3]The ALJ's decision states that Plaintiff's alleged disability onset date was April 1, 2008.  (AR 20.)  It is unclear why the ALJ chose that date, as her alleged onset date appears to have been November 30, 2007.  (AR 82; see also AR 359 (ALJ stating that he "[doesn't] know where [April 1, 2008] date came from").)  Plaintiff does not argue, however, that the ALJ's determination of the alleged onset date was error.  (See J. Stip. at 2 (noting that ALJ determined alleged onset date to be "April 1, 2008," but not alleging that date was error).)  Thus, the Court will not address that issue.  See Greger v. Barnhart, 464 F.3d 968, 973 (9th Cir. 2006) (issues not raised before the district court are waived).

determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing. (Id.) At step four, the ALJ found that Plaintiff retained the RFC to perform a range of medium work[4] with the additional limitations that Plaintiff

> can perform work that does not require climbing ladders, ropes or scaffolds, or crawling; and no more than occasional stooping or crouching. [Plaintiff] is precluded from performing overhead work, and can posture her neck in a static position for no more than 10 minutes (i.e., without an opportunity to otherwise flex, extend or rotate her neck while remaining on task).

(AR 22-23.) Based on the VE's testimony, the ALJ concluded that Plaintiff was able to perform her past work as a child monitor. (AR 26.) In the alternative, the ALJ found that Plaintiff could also perform the jobs of parking-lot booth attendant, security guard, labeler/ticketer, sorter, stuffer, and assembler. (AR 26-27.) The ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform. (AR 27.) Accordingly, the ALJ determined that Plaintiff was not disabled. (AR 27-28.)

**V.   DISCUSSION**

Plaintiff alleges that the ALJ erred in (1) determining that she could perform jobs that may involve overhead reaching and (2)

---

[4]"Medium work" is defined as involving "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). The regulations further specify that "[i]f someone can do medium work, we determine that he or she can also do sedentary and light work," as defined in § 404.1567(a)-(b). Id.

failing to properly consider Plaintiff's testimony regarding her
subjective symptoms.  (J. Stip at 4.)

     A.   <u>The ALJ Did Not Err in Failing to Inquire Further About</u>
            <u>a Potential Conflict Between the Dictionary of</u>
            <u>Occupational Titles and the VE's Testimony Because No</u>
            <u>Conflict Existed</u>

Plaintiff contends that the ALJ erred in determining she
could perform the jobs the VE identified because he did not first
inquire about a potential conflict between her testimony and the
Dictionary of Occupational Titles ("DOT").  (J. Stip. at 5-12.)
Plaintiff asserts that an unresolved conflict existed because the
jobs the VE testified Plaintiff could perform are all described
in the DOT as requiring a level of reaching ranging from
"occasional" to "constant" and may include overhead reaching,
whereas the ALJ found that Plaintiff was "precluded from
performing overhead work."  (J. Stip. at 5-12.)  As explained
below, Plaintiff misapprehends the phrase "overhead work."
Because the ALJ did not find that Plaintiff's ability to reach
was impaired, no conflict existed between the VE's testimony and
the DOT.

       1.  <u>Applicable law</u>

An ALJ must ask a hypothetical question to a VE that is
based on medical assumptions supported by substantial evidence in
the record and that reflects all of the plaintiff's limitations.
<u>Roberts v. Shalala</u>, 66 F.3d 179, 184 (9th Cir. 1995).  When a VE
provides evidence about the requirements of a job, the ALJ has a
responsibility to ask about "any possible conflict" between that
evidence and the DOT.  <u>See</u> SSR 00-4p, 2000 WL 1898704, at *4;

1  <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152-54 (9th Cir. 2007)

2  (holding that application of SSR 00-4p is mandatory).  An ALJ's

3  failure to do so is procedural error, although the error is

4  harmless if no actual conflict existed or the VE provided

5  sufficient evidence to support the conclusion.  <u>Id.</u> at 1154 n.19.

6       The Court must consider the ALJ's decision in the context of

7  "the entire record as a whole"; if the "evidence is susceptible

8  to more than one rational interpretation, the ALJ's decision

9  should be upheld."  <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194,

10  1198 (9th Cir. 2008) (internal quotation marks omitted).

11          2.   <u>Relevant facts</u>

12       During the hearing, the ALJ posed the following hypothetical

13  to the VE:

14       For the first hypothetical, assume a person of the

15       claimant's age, education, work experience, and skill

16       set; who is able to perform light work as defined in the

17       regulations, including exerting up to 20 pounds of force

18       occasionally, and/or up to 10 pounds of force frequently,

19       and/or a negligible amount of force constantly, to move

20       objects.  This person can stand, and walk, and/or sit up

21       to six hours in an eight-hour workday with normal breaks.

22       This person would perform work that did not require the

23       climbing of ladders, ropes, and scaffolds; not require

24       crawling; and no more than occasional stooping or

25       crouching. . . .  <u>This person would be precluded from</u>

26       <u>performing overhead work.</u>  Additionally, this person

27       would perform work that did not require the static

28       posturing of the neck, in other words, keeping the neck

                                    8

1  and head in a static, steadfast position, for more than
2  10 minutes at a time.

3  (AR 381-82 (emphasis added).)  The VE responded that Plaintiff
4  could perform the jobs of "parking lot booth attendant,"
5  "unarmed, unskilled security guard positions," and "some labeler
6  or . . . ticketer positions."  (AR 382-83.)

7      The ALJ then posed a second hypothetical:

8      For the second hypothetical, assume everything in the
9      first hypothetical, except this person would be limited
10     to the performance of sedentary work as defined in the
11     regulations, including exerting up to 10 pounds of force
12     occasionally and/or a negligible amount of force
13     frequently to move objects, including the human body.  In
14     addition, this person would perform work that did not
15     require more than two hours of standing and walking in an
16     eight-hour workday with normal breaks.

17  (AR 383.)  The VE responded that, based on the limitation to
18  sedentary work and the limitation to "two hours . . . of standing
19  and walking" and "the static of the neck," Plaintiff could not
20  perform any work.  (Id.)  The ALJ later clarified with respect to
21  that hypothetical that the neck movement restriction meant that
22  the person "cannot . . . keep their head in one position, for
23  more than 10 minutes," but "within 10 minutes, or after 10
24  minutes, the person can rotate their neck, flex, or extend their
25  neck[,] and go back to what they were doing" without having to
26  get up or leave the workstation.  (AR 386-89.)  The VE then found
27  that Plaintiff could perform the sedentary jobs of "sorter,"
28  "stuffer," and "assembler."  (AR 389-90.)

1    The ALJ also posed a third hypothetical:

2    [F]or the third hypothetical, assume everything in the

3    first hypothetical, except we're at the medium exertion

4    level . . . which is, an individual who can exert up to

5    20 to 50 pounds of force occasionally, and/or 10 to 20

6    pounds of force frequently, and/or greater than

7    negligible, up to 10 pounds of force, constantly, to move

8    objects.  All of the other criteria would remain the

9    same, including standing and walking up to six hours in

10   an eight-hour workday with normal breaks.

11   (AR 384.)  Based on that hypothetical, the VE found that

12   Plaintiff could perform her past relevant work as a "babysitter .

13   . . both as generally and actually performed."  (AR 384-85.)

14      At the close of the VE's testimony, the ALJ asked him

15   whether any of his testimony "conflict[ed] with or diverge[d]

16   from the information in the Dictionary of Occupational Titles."

17   (AR 392.)  The VE answered that it did not.  (Id.)  In his

18   written opinion, the ALJ found that "[p]ursuant to SSR 00-4p, the

19   vocational expert's testimony is consistent with the information

20   contained in the Dictionary of Occupational Titles."  (AR 27.)

21          3.  Analysis

22      Based on the VE's testimony, the ALJ found that Plaintiff

23   could perform the jobs of child monitor, parking-lot booth

24   attendant, security guard, labeler/ticketer, sorter, stuffer, and

25   assembler.  (AR 26-27.)  The DOT states that the child monitor

26   position requires reaching "Occasionally - Exists up to 1/3 of

27   the time."  DOT 301.677-010, 1991 WL 672652.  The jobs of

28   parking-lot attendant, security guard, stuffer, and assembler all

10

require reaching "Frequently - Exists from 1/3 to 2/3 of the time."  DOT 915.473-010, 1991 WL 687865 (parking-lot attendant); DOT 372.667-034, 1991 WL 673100 (security guard); DOT 731.685-014, 1991 WL 679811 (stuffer); DOT 713.687-018, 1991 WL 679271 (assembler).  The jobs of labeler/ticketer and sorter require reaching "Constantly - Exists 2/3 or more of the time."  DOT 229.587-018, 1991 WL 672150 (labeler/ticketer); DOT 734.687-082, 1991 WL 679966 (sorter).  Reaching is defined as "extending the hands and arms in any direction."  SSR 85-15, 1985 WL 56857, at *7 (emphasis added).  Plaintiff argues that the reaching requirements of all the aforementioned jobs conflict with the ALJ's finding that she was "precluded from performing overhead work," because reaching involves reaching in "any direction," including overhead.  (J. Stip. at 5-12.)

Plaintiff's argument fails because the ALJ did not preclude Plaintiff from performing "overhead reaching" – instead, he precluded her from performing "overhead <u>work</u>."  Viewed in the context of the evidence as a whole, see <u>Ryan</u>, 528 F.3d at 1198, the ALJ most reasonably intended to preclude Plaintiff from doing jobs that require nearly constant upward gazing and extension of the neck to perform work above the head, such as a tree trimmer or window washer.

This interpretation is consistent with the medical evidence, which showed that Plaintiff had a neck injury and pain when fully extending the neck (<u>see, e.g.</u>, AR 212; 236-43; 244-51; 253; 254-57; 268-70; 321), but did <u>not</u> show that she could never reach overhead.  (<u>See</u> AR 212 (noting that "[the] range of motion of [Plaintiff's] head at the neck is limited due to pain at the

11

extremes of movement especially when looking up and down or with moving side to side"); AR 341, 344 (noting that Plaintiff's RFC restricted her to "limited" "overhead lifting" and that she could do some overhead reaching).)  It is also consistent with Plaintiff's statement to her doctor that when EZ Lube placed her in a job that involved a great deal of window washing she could not work because of the steady "looking up and reaching up on high windows."  (AR 289.)

The interpretation of "work" to mean "jobs" rather than "reaching" also comports with principles of word use and grammar. In the sentence immediately following his use of the phrase "overhead work," the ALJ listed a number of movements that Plaintiff could never perform.  Had he intended to say that Plaintiff could perform no reaching, he more likely would have simply inserted the word "reaching" into that list.  Indeed, the undersigned has read dozens of Social Security decisions, and ALJs regularly prescribe limitations of various kinds on "reaching" or "overhead reaching."  See, e.g., Hill v. Astrue, 688 F.3d 1144, 1148 (9th Cir. 2012) (noting that ALJ's RFC placed limit on overhead "reach[ing]"); Mondragon v. Astrue, 364 F. App'x 346, 348 (9th Cir. 2010) (same).  The use of the phrase "overhead work" was surely intended to mean something else.  In many places in the Social Security regulations, the Commissioner himself has used "work" to mean "job" or "jobs."  See, e.g., 20 C.F.R. § 404.1520(f) (using "past relevant work" to mean prior job); Petsch v. Astrue, No. 11-CV-00925(F), 2012 WL 3313553, at *8 n. 6 (W.D.N.Y. July 19) (noting that § 404.1567(c) defines "medium work" as "jobs that require" certain functions), accepted

12

1  by 2012 WL 3314821 (W.D.N.Y. Aug. 13, 2012).  Finally, the Court

2  doubts that any dictionary lists "reaching" as a synonym for

3  "work," but many define the latter word as meaning "job."  See,

4  e.g., Work Definition, The Free Dictionary,

5  http://www.thefreedictionary.com/work (last visited Sept. 24,

6  2012) (defining work (n.) as "[a] job; employment").

7       According to the DOT descriptions, none of the jobs the ALJ

8  found that Plaintiff could perform appear to involve doing work

9  above the head.  Thus, interpreting the ALJ's findings in the

10  manner most consistent with the medical evidence and other

11  principles of construction, no conflict existed between the VE's

12  testimony and the DOT and the ALJ was not required to inquire any

13  further.  Reversal is therefore not warranted on this basis.

14       B.   The ALJ Did Not Improperly Discount Plaintiff's

15            Subjective Symptom Testimony

16       Plaintiff next argues that the ALJ "improperly assessed her

17  subjective symptom testimony" in evaluating her RFC.  (J. Stip.

18  at 18.)  According to Plaintiff, her testimony alleging she was

19  incapable of performing all but the most basic of activities was

20  consistent with the medical evidence and thus the ALJ should not

21  have discounted it.  (Id. at 18-25.)  Reversal is not warranted

22  on this basis, however, because the ALJ made specific findings as

23  to Plaintiff's credibility that were consistent with the medical

24  evidence of record.

25       1.   Applicable law

26       An ALJ's assessment of pain severity and claimant

27  credibility is entitled to "great weight."  See Weetman v.

28  Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

1  F.2d 528, 531 (9th Cir. 1986).  When the ALJ finds a claimant's
2  subjective complaints not credible, the ALJ must make specific
3  findings that support the conclusion.  See Berry v. Astrue, 622
4  F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative evidence of
5  malingering, the ALJ must give "clear and convincing" reasons for
6  rejecting the claimant's testimony.  Lester, 81 F.3d at 834.  If
7  the ALJ's credibility finding is supported by substantial
8  evidence in the record, the reviewing court "may not engage in
9  second-guessing."  Thomas v. Barnhart, 278 F.3d 947, 959 (9th
10  Cir. 2002).

11              2.  Relevant facts

12      In August 2010, Plaintiff filled out a Function Report
13  describing her subjective symptoms.  (AR 107-15.)  In it she
14  alleged that she needed to rest every 10 to 15 minutes because
15  her back and neck started to hurt (AR 107, 110, 112, 115); she
16  could not comb her hair, shave, dress herself, use the toilet, or
17  prepare food without help (AR 108-09); she could lift no more
18  than five pounds and "will hurt after" in her back and neck (AR
19  112); and she could not read or write for longer than five
20  minutes at a time because her back and neck would start to hurt
21  (AR 111-12, 115).  But she also stated that she was able to
22  "cook, clean, [and] take [her son] to school" (AR 108); wash
23  dishes and do "one or two loads" of laundry "every day" (AR 109);
24  "go out every day [to] sit at [the] park or try to walk" "half a
25  block" before needing to rest (AR 110, 112); and do her own
26  grocery shopping (AR 110).  Her hobbies included "bike rid[ing],
27  cards, sight [seeing], and swim[ming]" as well as going to
28  "parks" and "church" "once a week when I feel OK," though she

14

1  "can't ride [too] long" or "read longer [than] 5 min" without
2  pain.  (AR 111.)  She stated that she took several prescription
3  pain medications but "every pain med got me sick."  (AR 114.)

4      At the hearing Plaintiff testified that she felt she could
5  not work because

6      I'm constantly in pain when I'm sitting down, when I'm
7      standing up, when I'm doing anything.  I can't really do
8      anything.  And then, I'm constantly in pain.  I can't
9      think right when I'm in pain.  And then, when I'm taking
10     the pills, I'm constantly like sleepy, sick, where I
11     can't, can't function right.  When I'm out, I can't even
12     take the pills, because I've got to constantly think,
13     right?  And do things.

14 (AR 363.)  She further testified that she could take the
15 medication only at night because of the side effects.  (AR 363-
16 64.)  She stated that she had pain "directly in the lower back
17 and around my neck," and "when I'm shopping, I can't even shop .
18 . . I can't stay too long in a store."  (AR 364.)  Plaintiff
19 stated that she used Vicodin for pain management and that she had
20 tried injections but "[i]t gave me a side effect of bleeding" so
21 she "couldn't do that again."  (AR 364-65.)  She also stated that
22 she got headaches but that they were controlled with the same
23 pain medication she took for her neck and back.  (AR 356.)  She
24 testified that she "did not want to" have surgery for her
25 injuries because she knew other people who had had similar
26 surgeries and had not gotten better.  (AR 366-67.)  She stated
27 that her back pain was helped by doing exercises that stretched
28 her back.  (AR 368-69.)  She also testified that she was

"constantly in pain" in her neck "just by sitting up," and that "the only time I feel good" is "[w]hen I'm [lying] down." (AR 369.) She stated that during the day she "tr[ies] to lie] down" and "get up, take walks," but exercising makes her pain "worse." (AR 370.)

Plaintiff described her daily activities as follows:

> Wash a couple of dishes, make sure my son goes to school, make a few phone calls here and there, do things – take care of the bills I need to take care of, call around, try to do it through credit card[.] . . . Take walks and stuff. I just take a walk down the street or something. . . . Try to take walks. I try not to stay indoors too much.

(AR 371.) She stated that she generally spends "a few hours" each day "out walking around." (Id.) She further stated that she "sometimes" cooks for her son and does laundry. (AR 372.)

In his written decision the ALJ noted that he had considered Plaintiff's hearing testimony as well as the testimony of her boyfriend, Villasenor, and the third-party report submitted by Plaintiff's friend Lucy Guegera.[5] (AR 23; see AR 116-23 (third-party report); AR 4-23 (Plaintiff's and Villasenor's hearing testimony).) He then analyzed the objective medical evidence. (AR 24-26.)

The ALJ first noted that records from Dr. Augusto Rodriguez dated "around the alleged onset date" (they were dated March 24, 2008) showed that Plaintiff "primarily complained of only neck

---

[5] Plaintiff does not contest the ALJ's evaluation of Villasenor's and Guegera's testimony. (See J. Stip. at 18-25.)

pain," and "[c]linical findings in January 2008 revealed some tenderness in the posterior cervical musculature, decreased range of motion in the neck with extreme movement, and spasm." (AR 24, 212.)  He further noted that despite Plaintiff's allegations of "significant" neck pain, she received only conservative treatment from Dr. Rodriguez, "including prescription medication and chiropractic therapy." (AR 24, 198, 203, 205.)  He also noted that MRIs of her cervical and lumbar spine revealed minimal impairments, and her symptoms improved over time with treatment; "[b]y March 2008, [Plaintiff] had normal ranges of motion in the head and neck." (AR 24, 188, 198, 228-30.)

The ALJ next analyzed the notes from Plaintiff's treating physician, Dr. Daniel Capen. (AR 24, 232-99.)  Specifically, he observed the following:

> Contrary to Dr. Rodriguez's records demonstrating gradual, but steady improvement in the claimant's symptoms, on initial evaluation in May 2008 with Dr. Capen, the claimant reported extensive subjective allegations of sharp, stabbing pain in the neck and back, with associated numbness and weakness, amongst other complaints. [(AR 291.)]  Clinical findings, however, were positive only for some tenderness and decreased ranges of motion in the cervical and lumbar spine along with some spasm in the cervical spine. [(AR 292.)]  Straight-leg raising was negative bilaterally and the claimant demonstrated normal gait. [(AR 292-93.)]  Following this initial evaluation, Dr. Capen opined that the claimant should not lift over 10 pounds.  While the

17

1    Administrative Law Judge finds such restriction as
2    extreme and not bolstered by any objective support, Dr.
3    Capen did indicate, however, that the claimant "may
4    continue to work" under such restriction. [(AR 296.)]
5    Moreover, as described below, even if the claimant were
6    given the benefit of the doubt and restricted to
7    sedentary work, which complies with the 10 pound lifting
8    restriction, there are still significant numbers of
9    "other" work, which she may perform, per the vocational
10   expert's testimony.

11       The bulk of Dr. Capen's treating notes indicate
12   similar clinical findings from his initial evaluation,
13   with no indication of worsening of symptoms. Consistent
14   with Dr. Rodriguez's care, the claimant was under
15   conservative treatment with Dr. Capen, including physical
16   therapy, medications for symptoms relief, and the use of
17   a cervical pillow. [(AR 271, 254, 256.)] Although the
18   claimant testifies that her medications cause drowsiness,
19   there are no such complaints documented within Dr.
20   Capen's treatment notes. In the August 2009 permanent
21   and stationary report, Dr. Capen noted that the claimant
22   was not interested in any invasive treatment. She even
23   denied pain management. [(AR 246.)] Given the
24   claimant's extreme allegations of pain and related
25   functional difficulties, denial of such treatment appears
26   inconsistent and suggests that the claimant's symptoms
27   may not be as intense as she has alleged. Dr. Capen's
28   only advice for future medical care was further

18

evaluation of the claimant's complaints of TMJ pain,
which subsequent records and hearing testimony have not
highlighted as a continuing bothersome condition, and gym
and pool membership. [(AR 247.)] In terms of functional
limitations, Dr. Capen noted in the August 2009 report
that the claimant should be precluded from heavy work
activity, overhead activity, and static posturing. [(AR
249.)]

Following Dr. Capen's permanent and stationary
report, the record is relatively silent on further
treatment or evaluation for the claimant's neck and back
pain. Subsequent, and intermittent, re-evaluations by
Dr. Capen revealed no notable changes in physical
findings or treatment protocol. [(AR 233, 236.)]

(AR 24-25 (citation omitted).)

The ALJ then noted that in August 2009, Plaintiff underwent
a DMV physical that showed "no acute distress," during which she
"made no complaints of any musculoskeletal pain," and
"examination of the neck was normal as was her gait." (AR 25,
159.) He also noted that in October 2010, Plaintiff underwent a
consultative internal medicine evaluation that showed she was in
"no acute distress," "demonstrated normal gait with full back
range of motion without pain," and "was able to get on and off
the examination table without any difficulty and exhibited
negative straight-leg raising." (AR 25, 320-21.) He further
observed that "[a]lthough there was some pain on full extension
of the neck, overall, she had normal cervical range of motion,"
and "[e]valuation of the upper and lower extremities was also

19

normal, with no positive findings on sensory examination or motor strength." (AR 25, 321-22.) He noted that the examiner concluded Plaintiff "would be capable of performing the full range of medium work," and "[t]he State Agency medical consultant largely agreed with the consultative examiner's functional assessment, adding only that the claimant would have limited reaching capacity." (AR 25, 322, 338-46.)

The ALJ concluded his evaluation of Plaintiff's symptoms as follows:

> In determining the claimant's residual functional capacity, the Administrative Law Judge has carefully considered all of the objective findings of record, the treating, examining, and reviewing physicians' opinions, the claimant's subjective allegations, as well as the statements and/or testimony of her friend and boyfriend. In doing so, the undersigned has decided to limit the claimant to a less than full range of medium work, the function-by-function details of which are set forth in the above residual functional capacity. The undersigned has incorporated the work restrictions from the most recent functional assessment by treating physician Dr. Capen, as well as the limitations set forth by the consultative examiner and State Agency physician. In consideration of the claimant's extreme allegations of pain and her obesity impairment, per Social Security 02-1p, the undersigned has included additional postural limitations not addressed by any of the treating or examining physicians of record. Accordingly, the

20

1    residual functional capacity set forth herein is the most
2    restrictive functional assessment ascribed to the
3    claimant, and no medical evidence suggests the need for
4    further limitations.

5  (AR 26 (citations omitted).)

6         3.  <u>Analysis</u>

7         The ALJ found that Plaintiff's "statements concerning the
8  intensity, persistence and limiting effects of [her] symptoms are
9  not credible to the extent they are inconsistent with [the ALJ's]
10 residual functional capacity assessment."  (AR 24.)  Reversal is
11 not warranted based on the ALJ's alleged failure to make proper
12 credibility findings or properly consider Plaintiff's subjective
13 symptoms.

14        Although the medical evidence established that Plaintiff had
15 medically determinable physical impairments that were likely to
16 cause her some pain, the existence of some pain does not
17 constitute a disability if it does not prevent Plaintiff from
18 working.  <u>See</u> <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989)
19 (SSI program "intended to provide benefits to people who are
20 unable to work; awarding benefits in cases of nondisabling pain
21 would expand the class of recipients far beyond that contemplated
22 by the statute."); <u>Thorn v. Schweiker</u>, 694 F.2d 170, 171 (8th
23 Cir. 1982) ("A showing that [claimant] had a back ailment alone
24 would not support a finding that she was disabled unless the
25 limitations imposed by the back ailment prevented her from
26 engaging in substantial gainful activity.").

27        Here, the ALJ made specific, convincing findings in support
28 of his adverse credibility determination.  He noted that clinical

findings from several doctors revealed only mild impairment in Plaintiff's neck and back; her MRI results revealed only minimal abnormalities; examinations in August 2009 and October 2010 revealed that Plaintiff appeared healthy and showed no obvious signs of pain or distress other than "some pain on full extension of the neck"; Plaintiff's symptoms appeared to improve over time with medication and conservative treatment; and several doctors, including Plaintiff's own treating physician, stated that she was able to work.  (AR 24-25.)  He further correctly noted that when she underwent a DMV physical in August 2009 to try to get her driver's license reinstated, she "presented as healthy appearing, in no acute distress," she "made no complaints of musculoskeletal pain," and "examination of the neck was normal as was her gait." (AR 25.)  The ALJ also noted that "even if [Plaintiff] were given the benefit of the doubt and restricted to sedentary work . . . there are still significant numbers of 'other' work, which she may perform."  (AR 24.)

Plaintiff argues that under <u>Bunnell</u>, 947 F.2d at 345, the ALJ erroneously rejected Plaintiff's subjective pain testimony on the ground that "it lacks support in the objective medical evidence."  (J. Stip. at 19.)  <u>Bunnell</u> held that "once the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain."  947 F.2d at 345.  Here, the ALJ did not base his opinion "solely" on a lack of objective medical evidence corroborating the severity of Plaintiff's pain.  Instead, he properly analyzed what the medical

22

1   evidence did show (and what it did not) and noted that

2   Plaintiff's MRI and other test results revealed minimal

3   abnormalities, the majority of Plaintiff's symptoms were

4   controlled with medication or other conservative treatment, and

5   several doctors, including Plaintiff's own treating physician,

6   had examined Plaintiff and found her capable of working.  (AR 24-

7   25); see Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)

8   ("While subjective pain testimony cannot be rejected on the sole

9   ground that it is not fully corroborated by objective medical

10  evidence, the medical evidence is still a relevant factor in

11  determining the severity of the claimant's pain and its disabling

12  effects.").  The ALJ's reasons in total constituted appropriate

13  bases for discounting Plaintiff's subjective symptom testimony.

14  See, e.g., Williamson v. Comm'r of Soc. Sec., 438 F. App'x 609,

15  610 (9th Cir. 2011) (proper for ALJ to discount plaintiff's

16  testimony when there was evidence plaintiff "exaggerated her

17  symptoms"); Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir.

18  2001) (credibility determination based on, among other things,

19  plaintiff's "tendency to exaggerate" proper when supported by

20  "substantial evidence"); Tommasetti v. Astrue, 533 F.3d 1035,

21  1039 (9th Cir. 2008) (ALJ may infer that claimant's "response to

22  conservative treatment undermines [claimant's] reports regarding

23  the disabling nature of his pain"); Johnson v. Shalala, 60 F.3d

24  1428, 1434 (9th Cir. 1995) (holding that "contradictions between

25  claimant's testimony and the relevant medical evidence" provided

26  clear and convincing reasons for ALJ to reject plaintiff's

27  subjective symptom testimony); Flaten v. Sec'y of Health & Human

28  Servs., 44 F.3d 1453, 1464 (9th Cir. 1995) (ALJ may properly rely

23

on minimal medical treatment); <u>Stubbs-Danielson v. Astrue</u>, 539
F.3d 1169, 1175 (9th Cir. 2008) (doctors' opinions finding
plaintiff "could perform a limited range of work [] support the
ALJ's credibility determination").

Plaintiff also argues that the ALJ erred in considering
Plaintiff's ability to engage in daily activities as evidence of
her lack of credibility. (J. Stip. at 21-22 (citing <u>Vertigan v.
Halter</u>, 260 F.3d 1044, 1050 (9th Cir. 2001)).) It does not
appear that the ALJ relied on Plaintiff's ability to carry out
daily activities in formulating his opinion (<u>see</u> AR 23-26), but
even if he had, it would not have been error. When a plaintiff
claiming disability is able to spend a substantial part of his or
her day performing physical functions that are transferable to a
work setting, an ALJ may properly discredit his or her
allegations of complete inability to work. <u>See</u> <u>Morgan v. Comm'r
of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999). Here,
many of the activities Plaintiff acknowledged engaging in are
consistent with her past work as a babysitter as well as some of
the other jobs identified by the VE. For instance, she
acknowledged cooking, cleaning, doing laundry, and taking her son
to school. (AR 108-09, 372.)

Finally, Plaintiff argues that the ALJ erred in finding that
(1) there was no documented evidence in the record that Plaintiff
complained her medications made her drowsy and (2) she received
only "conservative" treatment for her ailments. (J. Stip. at 22-
23.) As to the first contention, the record does contain a
notation that Plaintiff "has been working with dizziness and
drowsiness because of the medication she is taking." (AR 290.)

1    To the extent the ALJ erred in failing to note that, however, the
2    error was harmless because nothing indicates that Plaintiff's
3    "dizziness and drowsiness" prevented her from working.   To the
4    contrary, it appears she was in fact working at the time she
5    complained of dizziness and drowsiness.   (See id. (noting that
6    Plaintiff's "hours have been reduced to 20 hour per week" and she
7    "has been working with dizziness and drowsiness").)   Moreover, as
8    noted above, the ALJ cited ample other evidence in the record
9    showing that Plaintiff's symptoms were not as severe as she
10   claimed.   Thus, reversal is not warranted on this basis.
11   See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th
12   Cir. 2006) (nonprejudicial or irrelevant mistakes harmless);
13   Carmickle v. Comm'r of Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th
14   Cir. 2008) (holding that when ALJ provides specific reasons for
15   discounting plaintiff's credibility, decision may be upheld even
16   if certain reasons for adverse credibility finding were invalid
17   as long as ALJ's "remaining reasoning and ultimate credibility
18   determination" were supported by substantial evidence (italics
19   omitted)); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190,
20   1197 (9th Cir. 2004) ("[I]n light of all the other reasons given
21   by the ALJ for Batson's lack of credibility and his residual
22   functional capacity, and in light of the objective medical
23   evidence on which the ALJ relied, there was substantial evidence
24   supporting the ALJ's decision.").

25       Reversal is also not warranted based on the ALJ's alleged
26   error in noting that Plaintiff received only conservative
27   treatment for her injuries given that she also received epidural
28   shots.   (J. Stip. at 22.)   As an initial matter, the ALJ was

correct in noting that the record showed that conservative treatment appeared to improve Plaintiff's symptoms. (AR 24, 198 (noting that "Patient was treated with conservative chiropractic care to the cervical and upper thoracic spine" and "feels much better with the treatment prescribed" and "capable of returning to work"), 188 (noting that Plaintiff "has not been taking medications for several weeks now," "has normal range of motion in the head and neck," and complains only of "pain at the extremes of movement," and prescribing pain medication, "home exercise program," and chiropractic care).) It also appears from the record that Plaintiff received only one set of epidural injections.[6] (See AR 265-66.) Even assuming epidural injections are not simply further conservative treatment, remand is not required because the remainder of the ALJ's credibility findings were supported by ample evidence in the record. See Carmickle, 533 F.3d at 1162; Batson, 359 F.3d at 1197. This Court may not "second-guess" the ALJ's credibility finding simply because the evidence may have been susceptible of other interpretations more favorable to Plaintiff. See Tommasetti, 533 F.3d at 1039. Reversal is therefore not warranted on this basis.

---

[6]Plaintiff testified that she did not want to continue with the shots because "all that did was make me bleed." (AR 365.) The medical evidence shows that in fact she had "no untoward reactions" to the shots and "tolerated [them] well." (AR 265.) Plaintiff did seek medical treatment for heavy vaginal bleeding beginning approximately one month after she received the shots, but there is no indication in the record that the bleeding was in any way connected to the shots. (See AR 162-65.)

**VI.   CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[7] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: September 25, 2012

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[7]This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."